UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

RIVA DEL LAGO CONDOMINIUM ASSOCIATION, INC.,

Plaintiff,

v.

STEADFAST INSURANCE COMPANY,

Defendant.

Case No. 2:24-cv-01056-KCD-KRH

______________________________/

**ORDER**

Plaintiff Riva Del Lago Condominium Association, Inc. moves to exclude Defendant Steadfast Insurance Company's expert, Donald Leffert. (Doc. 68.)[1] Steadfast responded (Doc. 76), making this matter ripe. For the reasons below, Riva's motion is **DENIED**.

## I. Background

This case stems from an insurance policy and its alleged breach. Riva's high-rise condo development sustained damage from Hurricane Ian. (Doc. 3 ¶ 17.)[2] Steadfast covered the property at the time. (*Id.*) After Riva reported the loss, both sides hired experts to calculate the cost of repairing the building.

---

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

[2] For ease of reference, the Court cites the page numbers generated by its electronic filing system for all exhibits.

Their findings varied widely: Steadfast's team estimated the damage at $2,034,615, while Riva valued it at $24,144,445. (Doc. 67 ¶ 9; Doc. 75 ¶ 41.) That gap has not been bridged. To date, Steadfast has paid Riva only $8,307.49. (Doc. 75 ¶ 40.)

Riva's expert, Dr. Jain, and Steadfast's expert, Leffert, examined the property together. After Dr. Jain submitted his report, Leffert issued a rebuttal. Among other things, Leffert concluded that Hurricane Ian's winds were likely weaker than the forces the building was designed to withstand, meaning the building should have been able to resist them "by 17-20%." (Doc. 68-11 at 37.) Riva argues that Leffert did not explain or show the calculations used to reach this conclusion.

Leffert also opined that Dr. Jain's conclusion—that any water leakage through the windows and doors requires the replacement of the entire window and door—is inconsistent with industry practice. To that, Riva responds that Leffert does not identify any such industry practices. Leffert also concludes that earlier storms, which exceeded the strength the fenestrations were designed to withstand, were probably responsible for some of the observed damage. However, Riva argues that he "identifies no such storms, provides no historical wind data, and performs no comparative analysis." Finally, Leffert finds it suspicious that some window frames are bent outward when Ian would have caused them to bend inward. Riva responds: "he offers no wind

directionality analysis, pressure modeling, or discussion of leeward suction pressures, which could explain deformation patterns inconsistent with windward loading." In other words, why the frame bent opposite to the direction of force from the wind hitting the side of the building facing the storm.

To keep the jury from hearing a word of these opinions, Riva moves to exclude or limit Leffert's testimony.

## II. Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. A court should admit expert testimony if the proponent establishes:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Pete*, No. 23-14112, 2024 WL 4040388, at *1 (11th Cir. Sept. 4, 2024). At issue here is the second prong—reliability.

To determine whether an expert's methodology is reliable, courts consider:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Id.* Courts should consider these four factors, which come from *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), along with others tailored to the facts of the case. For example, Rule 702's Advisory Committee Notes delineate five additional factors to consider if relevant:

> (1) Whether the testimony grows naturally and directly out of research experts have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying; (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) Whether the expert has adequately accounted for obvious alternative explanations; (4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; and (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*United States v. Frazier*, 387 F.3d 1244, 1297 (11th Cir. 2004).

"In determining the admissibility of expert testimony under Rule 702, [t]he court serves as a gatekeeper, charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Monte v. Sherwin-Williams Dev. Corp.*, No. 6:23-CV-288-JSS-DCI, 2025 WL 90119, at *2 (M.D. Fla. Jan. 14, 2025). "Notwithstanding its critical gatekeeping function, the trial court is just that—a gatekeeper—and Rule 702 is a screening procedure, not an opportunity to substitute the trial court's judgment for that of a jury." *United States v. Barton*, 909 F.3d 1323, 1332 (11th Cir. 2018). Consequently, challenges to the weight and sufficiency of the expert testimony are improper, and ultimate conclusions as to the persuasiveness of

the proffered evidence are for the jury, not the court. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003); *Walters v. Altec Indus., Inc.*, No. 3:01-CV-371J12TEM, 2003 WL 25686829, at *3 (M.D. Fla. Sept. 3, 2003). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Still, an expert may be excluded when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## III. Discussion

Riva has no issue with Leffert's credentials, nor does it doubt the relevance of his testimony. The target here is reliability. Or, more precisely, the alleged lack of it. Riva does not argue that Leffert employed a flawed methodology; rather, it argues he employed no methodology at all, spinning conclusions out of thin air. Steadfast counters that this is exactly the sort of dispute meant for a jury box, not a judge's chambers—a classic question of credibility, not admissibility. The disputed portions of Leffert's opinions are addressed in turn.

### A. Wind Analysis

Dr. Jain concluded that Ian's wind pressure was higher than what the building was designed to withstand. Leffert found the opposite:

> Based on our review of the wind speeds produced by Hurricane Ian, we note similar wind speeds reported by both [Mr. Leffert] and [Dr. Jain] (120 miles per hour 125 miles per hour). Based on review of the design wind speed indicated on drawing S1.0 is 130 miles per hour calculated according to Chapter 6 of ASCE 7-98. Therefore, the original design pressures for the building and its components would have likely exceeded those generated by Hurricane Ian by 17 to 20%.

(Doc. 68-11 at 37.) Riva argues that Leffert "provides no calculations, pressure conversions, or discussion of exposure category or wind directionality in support of that conclusion, nor does he explain how it would preclude hurricane damage to twenty-year-old windows like those at the [p]roperty." (Doc. 68 at 12.) And not only did he not show his math, but he also used the original design pressures measured at shipment, ignoring twenty years of wear. Because "the performance ratings on which [Leffert] relies are only applicable once shipped from the factory and are not field tests that would have been performed at the conclusion of construction … [they] do not represent real-world windstorm conditions [or] account for how Riva's fenestration assemblies actually performed under fluctuating and nonuniform hurricane wind pressures." *Id.*

But this argument fails to show the Court why Leffert's opinion is based on "junk science." Leffert noted that a "drawing S1.0" states that the building was designed to withstand 130 mph winds. That number was apparently

calculated in accordance with Chapter 6 of ASCE 7-98. Thus, Leffert concluded that the building was designed to withstand Ian's wind by "17-20%."

Riva's criticisms of the design specifications Leffert used to form his conclusion relate to the accuracy of the information he used, not whether his results naturally follow the numbers he used. In other words, claiming that Leffert used incorrect figures to illustrate the building's capacity during the hurricane doesn't prove his report is unreliable. Leffert may choose the numbers he considers most appropriate in his professional judgment—all that matters is that his outputs align with his inputs. This type of objection is best for cross-examination or rebuttal testimony. *See Quiet Technology DC-8, Inc.*, 326 F.3d at 1345 ("Quiet does not argue that it is improper to conduct a CFD study using the sorts of aerodynamic data that Frank employed, but rather that the specific numbers that Frank used were wrong. Thus, the alleged flaws in Frank's analysis are of a character that impugn the accuracy of his results, not the general scientific validity of his methods.").

The Court cannot evaluate without a clear explanation of why relying on the original design specifications is unreliable. For example, Riva does not indicate whether using pressure ratings of uninstalled windows is an untested method or that such calculations are not widely accepted in the scientific community. It does not reference any guidelines indicating that a pressure test

is typically used to assess the building's strength. The Court thus has no basis to exclude Leffert's testimony as junk.

Certainly, the Court cannot assess whether Leffert's outputs align with his inputs without understanding what his inputs were. That's why Riva demands he to present his "calculations, pressure conversions, or discussion of exposure category or wind directionality." Steadfast provides an explanation. Apparently, Leffert used Dr. Jain's own math. He looked at the ASCE 7 Standard referenced by Dr. Jain and worked backward from Dr. Jain's reported results. His objective was to determine the input that Dr. Jain used for the "Exposure" of the building. To do that, "Leffert used quantities for the other inputs (factors required by the ASCE 7 Standard, such as Kz (velocity pressure exposure coefficient), Kd (wind directionality factor), and GCpi (internal pressure coefficient)), that he expected would be undisputed, and adjusted for angle of the wind." (Doc. 76 at 7.) He found that Dr. Jain used Exposure D, when he was supposed to use Exposure C. That explained Dr. Jain's inflation of wind pressures, which resulted to an inflation of around 17%. (Doc. 76 at 8.)

When he was later provided with Dr. Jain's calculations, he noticed that Dr. Jain did, in fact, use Exposure C. Instead, he incorrectly entered "1" as the value for Kd. And, according to the ASCE 7 Standard, a Kd value of 1 is applicable to only Circular Domes, Octagonal or Table 26.10-1 of Round Chimneys, Tanks, and Similar Structures." Steadfast provides the applicable ASCE guideline:

**Table 26.6-1. Wind Directionality Factor, $K_d$.**

| Structure Type | Directionality Factor $K_d$ |
|---|---|
| **Buildings** | |
| Main wind force resisting system | 0.85 |
| Components and cladding | 0.85 |
| **Arched roofs** | 0.85 |
| **Circular domes** | 1.0* |
| **Chimneys, tanks, and similar structures** | |
| Square | 0.90 |
| Hexagonal | 0.95 |
| Octagonal | 1.0* |
| Round | 1.0* |
| **Solid freestanding walls, roof top equipment, and solid freestanding and attached signs** | 0.85 |
| **Open signs and single-plane open frames** | 0.85 |
| **Trussed towers** | |
| Triangular, square, or rectangular | 0.85 |
| All other cross sections | 0.95 |

*Directionality factor $K_d = 0.95$ shall be permitted for round or octagonal structures with nonaxisymmetric structural systems.

In his professional opinion, 0.85 is the appropriate Kd input here. But, "the mathematical impact due to the perceived misapplication of the Exposure input is equivalent to [Dr. Jain's] actual misapplication of Kd[.]" Therefore,

Leffert stands on his professional opinion that Dr. Jain overexaggerated his wind pressure calculations. In support, he attaches the following:



HALLIWELL
Engineering Associates
865 Waterman Avenue
East Providence, Rhode Island 02914

| | | | |
|---|---|---|---|
| PROJECT: | Riva del Largo | | |
| PROJECT No.: | HEA.003092 | SHEET No. | 1 |
| CALCULATED BY: | DML | DATE: | |
| CHECKED BY: | | DATE: | |

Design Loads

ASCE 7-22

H) Components and Cladding:

**Mean Roof Levels Greater Than 60 feet**

| | | |
|---|---|---|
| Ke = | 1.0 | |
| V = | 120 | mph |
| Kt = | 1.0 | |
| Kd = | 0.85 | |
| Exposure | C | |
| Zg = | 900 | ft |
| α = | 9.5 | |

External Pressure Coefficients

| | | GCp | | | | | |
|---|---|---|---|---|---|---|---|
| Negative | 4 | -0.900 | -0.900 | | | | |
| Negative | 5 | -1.800 | -1.800 | | | | |
| | Area = | 10 | 20 | 50 | 100 | 200 | 500 |

| | | GCp | | | | | |
|---|---|---|---|---|---|---|---|
| Negative | | | | | | | |
| | Area = | 10 | 20 | 50 | 100 | 200 | 500 |

Internal Pressure Coefficients

GCi = +/- 0.18

| | | |
|---|---|---|
| Exposure | D | |
| Zg = | 700 | ft |
| α = | 11.5 | |

Building :

| L (ft) | B (ft) | h' (ft) | Kh | qh (psf) | Area (ft2) | Negative Net Design Pressures q*(GCpe +GCpi) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 220.0 | 1.49 | 46.8 | Area | Zones | Exposure C | | | Exposure D | |
| | | Exposure C | | | 0 | 4 | -0.900 | **-50.6** | **psf** | **-55.6** | **psf** |
| | | Exposure D | | | 0 | 5 | -1.800 | **-92.7** | **psf** | **-102.0** | **psf** |
| | | h' (ft) | Kh | qh (psf) | | | **Increase from Exposure C to D** | | | **10%** | |
| | | 220.0 | 1.64 | 51.5 | | | | | | | |
| | | 80.0 | 1.21 | 37.8 | Area | Zones | Exposure C | | | Exposure D | |
| | | Exposure C | | | 0 | 4 | -0.900 | **-40.9** | **psf** | **-46.6** | **psf** |
| | | Exposure D | | | 0 | 5 | -1.800 | **-74.9** | **psf** | **-85.5** | **psf** |
| | | h' (ft) | Kh | qh (psf) | | | **Increase from Exposure C to D** | | | **14%** | |
| | | 80.0 | 1.38 | 43.2 | | | | | | | |

**Average Increase from Exposure C to D 17%**

| Elev | C | D | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0.85 | 1.03 | 21% | | | | | | | |
| | 0.9 | 1.08 | 20% | | | | | | | |
| | 0.94 | 1.12 | 19% | | | S to N | Bldg Angle | 60 | | |
| | 0.98 | 1.16 | 18% | | | | | | | |
| | 1.04 | 1.22 | 17% | Aveage | | | | | | |
| | 1.09 | 1.27 | 17% | 16.4% | 17% | 107 | 88.81 | 0.866025 | 76.91172 | |
| | 1.13 | 1.31 | 16% | | | 59 | 48.97 | 0.866025 | 42.40926 | |
| | 1.17 | 1.34 | 15% | 12 | | | | | | |
| | 1.21 | 1.38 | 14% | | | | | | | |
| | 1.24 | 1.4 | 13% | | | | | | | |
| 100 | 1.26 | 1.43 | 13% | | | | | | | |
| 120 | 1.31 | 1.48 | 13% | | | | | | | |

EXHIBIT
F

Ultimately, an expert must ground their opinion in reliable methods and principles, applying them reliability to the facts. It is not within the Court's authority to determine if the expert is correct; that is the jury's responsibility to evaluate. Leffert's opinion is reliable. First, the ASCE guidelines providing the formulas and inputs that Leffert relies on are established to be the industry standard. *See Rebholz v. AIG Prop. Cas. Co.*, No. 2:25-CV-00204-JES-DNF, 2026 WL 693184, at *3 (M.D. Fla. Mar. 12, 2026). Second, Leffert's report is peer-reviewed. (Doc. 76-2 at 29-30.) Third, Leffert's conclusion, now supported by the exact numbers and logic he used to arrive to it, is discernable and empirically testable—making it subject to effective cross-examination. "Accordingly, this is not a case where the jury was likely to be swayed by facially authoritative but substantively unsound, unassailable expert evidence." *Quiet Technology DC-8, Inc.*, 326 F.3d at 1345–46. "So long as the expert's testimony rests upon good grounds, it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors['] scrutiny for fear that they will not grasp its complexities or satisfactory [sic.] weigh its inadequacies." *Id.*

**B. Rebuttals**

Next, Riva tries to brand Leffert's disagreement with Dr. Jain's opinions as a textbook "analytical gap"—a case of an expert asking the court to just take

his word for it. *See General Elec. Co.*, 522 U.S. at 146. It argues that "Leffert's rebuttal opinions of [Dr. Jain's] report should be limited because they fail to meaningfully engage with, test, or refute Dr. Jain's methodology and conclusions." In its view, Leffert disagrees with Dr. Jain and fails to elaborate why.

But this argument lies on the fine line between the reliability and credibility of an expert's opinion. When evaluating the reliability of an expert's opinion, the Court must focus solely on the principles and methodology, not on the conclusions they generate or on whether those conclusions are correct. *Daubert*, 509 U.S. at 595; *Castro v. United States*, No. 2:15-CV-378-FTM-38CM, 2016 WL 5942354, at *4 (M.D. Fla. Oct. 13, 2016). The Court's focus here is to determine whether Leffert's conclusions are based on reliable science, not whether he offers a sufficient argument explaining why Dr. Jain's conclusions are unreliable. That is a job for the jury, who is tasked with weighing an expert's credibility. See *Daubert*, 509 U.S. at 595 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Furthermore, rebuttal testimony is permitted when "it directly addresses an assertion raised by an opponent's experts." *Burger King Corp. v. Berry*, No. 18-20435-CIV, 2019 WL 571483, at *2 (S.D. Fla. Jan. 8, 2019). "The purpose of rebuttal evidence is to explain, repel, counteract, or

disprove the evidence of the adverse party, and the decision to permit rebuttal testimony is one that resides in the sound discretion of the trial judge." *Frazier*, 387 F.3d at 1269.

Riva finds issue with the fact that, in his report, Leffert wrote: "[Dr. Jain] indicates that water penetration through the fenestrations has caused damage to a degree requiring replacement of the assembly. This opinion is not supported by any publications which Halliwell is [sic] of and is contrary to industry practices." Riva takes issue with the fact that "Leffert identifies no such publications, standards, or industry practices."

In its response, Steadfast attached an affidavit from Leffert clarifying that the industry practices he referred to were the "FEMA Local Officials Guide for Coastal Construction and AAMA/WDMA/CSA 101/I.S.2/A440, the North American Fenestration Standard/Specification for windows, doors, and skylights[.]" (Doc. 76-3 at 6.) That guidance apparently "explain[s] that wind-driven rain is expected to occur at doors and windows during hurricane events consistent with the Water Penetration Resistance Rating, which is typically 15 to 20 percent of the structural pressure rating of the window assembly, depending on the performance grade of the unit." (Doc. 76-3 at 6.) It is one of those engineering sentences that packs several technical ideas together, but all it means is that it takes only 15–20% of the pressure the window can handle to stay in the wall for water to leak through it. According to Leffert, this

guidance supports his opinion that "[w]ater penetration through the fenestrations is not a damaged condition [and it] will occur at low wind pressures when coupled with precipitation." (Doc. 76-3 at 7.) Simply put, Mr. Leffert took FEMA's rule, applied it to the facts, and opined that Dr. Jain's conclusion doesn't hold up against the rule. The Court finds no reason why Mr. Leffert should not rely on FEMA's guidelines, a recognized technical guide in the industry. And, although he does not explain in it in his report, the affidavit now sufficiently clarifies what he relied on. Now that Steadfast has the information it needs to efficiently cross-examine Leffert, what is left are two contradicting opinions for the jury to weigh.

Riva also points the Court to Leffert's statement that "numerous wind events have occurred since the original construction that have substantially exceeded" the test pressures he references. (Doc. 68-11 at 20.) Specifically, this is what Leffert wrote:

> Notably, when comparing subparagraph 'c,' the test pressure differential for water resistance is listed at 10 pounds per square foot while the structural test pressure differential is listed at 75 pounds per square foot. It should be noted that these performance requirements were applicable once shipped from the factory and are not field tests that would have been performed at the conclusion of construction. This does, however, highlight that the original design called for substantially more stringent structural requirements for the windows, with leakage through the windows anticipated at much lower pressures (on the order of 7.5 times). In the breadth of [Dr. Jain's] argument that water penetration through the fenestration constitutes a damaged condition warranting replacement, it is *likely* that numerous wind events have occurred since the original construction which have substantially exceeded the water resistance design pressure of 10 pounds per square foot and therefore would

> have been conditions of pre-existing damage prior to the passage of Hurricane Ian. From a basic standpoint, [Dr. Jain's] position that the passage of water through a fenestration has resulted in damage is not practical such a stance would make the prospect of incorporating windows in any construction endeavor a cost-prohibitive approach given the limited pressure thresholds that will cause windows to allow the passage water, even from low magnitude wind events when coupled with precipitation.

(Doc. 68-11 at 20.). In plain English: Dr. Jain argues that if water leaks through the windows, the windows are damaged. But if that's true, Leffert writes, the windows were probably already damaged before Hurricane Ian because they've "likely" been exposed to many storms over the years that were strong enough to cause the same kind of water intrusion. Riva claims that Leffert "identifies no such storms, provides no historical wind data, and performs no comparative analysis demonstrating that other post-construction events are responsible for the damage Dr. Jain identifies."

While these inputs would help Leffert's credibility, they have no effect on its reliability. For one, Leffert's theory can be tested. There either were, or were not, previous storms that caused water leakage. And Leffert testified that his report was peer reviewed. (Doc. 76-2 at 29-30.) Of course, not all the *Daubert* factors neatly apply to civil engineering expert testimony, and the district courts have discretion to apply *Daubert* as it fits into the case. But the court's role as gatekeeper "does not serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., State of Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996) And Riva is free to

challenge Leffert's theory in front of the factfinder. Therefore, the Court rejects Riva's position that "[s]peculation of this nature does not rebut Dr. Jain's conclusions and cannot satisfy Daubert." It does both.

Finally, Riva points the Court to the portion of the Halliwell report in which Leffert wrote:

> At Unit 2201 North a 48-inch level was placed at the sill framing member, on the interior side of the door, and a gap was present near the midpoint of the level (see Figure 4 below). Notably the deformation in the aluminum framing member tended towards the exterior while the sliding door was located on a windward exposure. Halliwell also documented that there were no indications of recent movement (i.e., separation from the surrounding and/or stretching) at the sealant bead applied at the corners of the gaskets and sliding door frame (see Figure 5 below). Walker also directed Halliwell's attention to gaps in the mitered joints in the aliminum storefront door on the south elevation.

(Doc. 68-11 at 14.) In other words, Unit 2201's door frame was bent outward. But, according to Leffert, Ian's wind pressure would have pushed it inward. The caulk was also found intact—to Leffert, that is a sign that the frame did not move recently. Therefore, Leffert concluded, the bent frame was probably pre-existing rather than caused by the hurricane. Later in the report, Leffert explains that he estimated Ian's winds to be "108 mph from the southwest" with "maximum 125 mph wind gusts from the south-southwest." (Doc. 76-1 at 52.)

Riva strikes again, claiming that Leffert "offers no wind directionality analysis, pressure modeling, or discussion of leeward suction pressures, which could explain deformation patterns inconsistent with windward loading [and, a]bsent any such analysis, Leffert's criticism rests entirely on assumption rather than engineering methodology and therefore cannot constitute a reliable rebuttal under Daubert." (Doc. 68-11 at 14.) But Leffert was not required to provide an explanation for why he could be wrong. That is Riva's job.

## IV. Conclusion

At bottom, *Daubert* is a gatekeeping rule, not a command to weigh the evidence before the jury gets a look. Riva has flagged plenty of areas to press Leffert on—from the precise meteorological inputs he used to his reliance on manufacturer specifications over field tests. But those are vulnerabilities to be exposed on cross-examination, not fatal methodological flaws that require striking his testimony. Leffert's methods are sufficiently grounded in accepted engineering practices to pass the threshold of admissibility. Whether his conclusions ultimately withstand scrutiny is a question for the jury. Accordingly, Riva's motion to limit Leffert's expert testimony (Doc. 68) is **DENIED**.

**ORDERED** in Fort Myers, Florida on July 30, 2026.

Kyle C. Dudek
United States District Judge